**HEWLETT–PACKARD COMPANY,**
Plaintiff,

v.

**GENRAD, INC., Defendant.**

Civ. A. No. 94–10675–RCL.

United States District Court,
D. Massachusetts.

June 19, 1995.

William W. Cochran, Hewlett–Packard Company, Palo Alto, CA, Edmond R. Bannon, Jonathan A. Marshall, John J. Lauter, Frank E. Morris, Lori S. Gentile, Walter E. Stalzer, Pennie & Edmonds, New York City, George Summerfield, Pennie & Edmonds, Washington, DC, Kevin P. Light, Nicholas J. Nesgos, Choate, Hall & Stewart, Boston, MA, Mary Scherchel Brady, George B. Curtis, Gibson, Dunn & Crucher, Denver, CO, William H. MacAllister, Hewlett–Packard Company, Boise, ID, for plaintiff.

Joseph H. Born, Thomas C. O'Konski, Cesari & McKenna, Boston, MA, Robert Paul Detrick, Holland & Hart, Denver, CO, for defendant.

## ORDER

BOWLER, United States Magistrate Judge.

Plaintiff Hewlett–Packard Company ("HP") filed this patent infringement action against defendant GenRad, Inc. ("GenRad") contending that GenRad's product, Opens Xpress I, literally infringes U.S. Patent No. 5,254,953 ("the '953 patent"), and that Gen-Rad's subsequently developed product, Opens Xpress II, infringes the '953 patent under the doctrine of equivalents. Pending before this court are five summary judgment motions which, after conducting an all day hearing, this court took under advisement.

## I. *DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NONINFRINGEMENT (DOCKET ENTRY # 90)*

GenRad moves for partial summary judgment on the basis that Opens Xpress II does not infringe the '953 patent under the doc-trine of equivalents. (Docket Entry # 90). In reply, HP filed an opposition and moved for summary judgment on the basis that Opens Xpress I literally infringes the '953 patent. (Docket Entry # 113).

The primary issue with respect to the former motion, as represented by the parties at the May 25, 1995 hearing, is whether the form of active guarding used in Opens Xpress II is a recognized equivalent of the claimed common signal return connection in the '953 patent, known in the art as passive guarding.

### A. *Background*

The '953 patent is a continuation in part of U.S. Patent No. 5,124,660 ("the '660 patent"). As such, the '953 claims certain matter already claimed in the '660 patent and adds other new matter. Both patents relate to products known as in circuit testers which test components on a circuit board to detect opens. Opens are faulty connections between one or more integrated circuits and the circuit board. (Bannon Declaration, No Docket Entry No. or File Date Stamp Assigned ("Bannon Declaration"), Ex. 1).

Circuit boards consist of a number of electrical components such as resistors, transistors and integrated circuits ("ICs"). Electrical conductors or electrically conductive paths known as "traces" run along and through a circuit board. A number of traces end in pads of bare metal to which leads or pins of the electrical components are soldered. As defined in the specification of the '953 patent, a pin and its trace generally form a "node." ('953 patent, Col. 1, l. 26–32).

The in circuit testers disclosed in the '660 and '953 patents capacitively test the integrity of the connections between the pins and the circuit board traces to which they should be connected. As described expressly in the specification and in the diagrams of the '953 patent, the pin under test (112) connects to an internal conductor (204) which forms a metallic plate and functions as one plate of a capacitor. A capacitive probe or conductive electrode (106) is placed above and in proximity[1] to the circuit board under test which

---

1. Figure 1 depicts a capacitive probe which does not contact the top of the printed circuit board.

forms the other plate of the capacitor and capacitively senses the signal of the pin under test (112). ('953 patent, Col. 7, l. 32–53).

Figure 1 depicts the pathway of the capacitive coupling when testing the connection (118) of the pin (112) under test. An oscillator (104) applies a voltage to a trace (114) on the circuit board which should be attached to the pin (112) under test. Through capacitative coupling, a current then passes from the pin (112) under test to the conductive electrode or capacitive probe (106) and then to a current measuring device shown as an ammeter (116). The measuring means, which is operatively coupled to the conductive electrode (106), measures the parameter indicative of the electrical connection between the pin (112) under test and the circuit assembly. In the event the measurement falls within certain predetermined limits, the pin (112) is properly and securely connected to the component (110) at the connection (118) being tested. If not, there is a faulty connection or open. ('953 patent, Col. 6, l. 48–Col. 7, l. 16, Col. 11, l. 54–61).

Figure 5 in the '953 patent shows a diagram of the disclosed invention testing an entire circuit board composed of already loaded components. A bed of nails tester with a number of probe pins contacts the underside of the printed circuit board (500) with the upper ends of the nails contacting traces on the circuit board which in turn connect to the pin under test. ('953 patent, Col. 9, l. 24–35 & l. 54–58).

In order to compare the claims of the '953 patent to the active guarding feature in Opens Xpress II under the doctrine of equivalents, this court turns to the language of claim 1 of the '953 patent. The claimed independent limitation at issue, which generally describes passive guarding, is underlined for emphasis.

1. A system for measuring the integrity of an electrical contact between an electrical connection pin of an electrical component and a first node of a circuit assembly, said system comprising:

(a) signal supplying means, comprising an output and a common signal return, for supplying an electrical current via said output to a pin of said electrical component;

(b) an electrical connection between a second node of the circuit assembly and said common signal return of said signal supplying means;

(c) a conductive electrode comprising a surface adapted to be placed in a fixed position in proximity to a surface of said pin; and

(d) measuring means, operatively coupled to said conductive electrode, for measuring a parameter indicative of a capacitance associated with connection of said pin to said circuit assembly, said capacitance being indicative of the integrity of the electrical connection between said pin and said circuit assembly.

All claims in the '953 patent contain the above, underlined limitation or the similar limitation of "electrically connecting a second node of said circuit assembly to a common signal return of said signal generator."

**B. *Discussion***

Summary judgment is proper "in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Johnston v. IVAC Corporation,* 885 F.2d 1574, 1576 (Fed.Cir. 1989). To prevail on summary judgment of noninfringement under the doctrine of equivalents, GenRad must "point out the absence of evidence in the record directed to proof of a matter on which [HP] bore the burden of proof and which was necessary to establish its case." *Becton Dickinson and Company v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed. Cir.1990) (depicting summary judgment standard for alleged infringer under doctrine of equivalents analysis). GenRad more than meets its burden by showing the absence of evidence concerning the way in which Opens Xpress II accomplishes the result of preventing parallel paths from interfering with the measurement of the pin under test vis a vis the way in which the claimed subject matter accomplishes this result.

It also depicts a dielectric insulator (108) between the capacitive probe (106) and the component (110).

Once GenRad sets "forth facts upon which its motion is premised, [HP] must come forward with specific facts showing that a genuine issue for trial exists." *Sears Roebuck and Company v. Sears Realty Company, Inc.,* 1993 WL 260677 at *3 (N.D.N.Y. July 8, 1993).

■ All limitations of the claim must be satisfied at least equivalently in order for the claimed invention and the accused device to "work 'in substantially the same way.'" *Becton Dickinson and Company v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed.Cir.1990) (citing *Graver Tank & Manufacturing Company v. Linde Air Products Company,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), and *Pennwalt Corporation v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988)). This court previously set forth the law with respect to the doctrine of equivalents in the February 10, 1995 Order. For ease of reference, this court repeats that, as previously stated:

> The doctrine is an exception and not the rule. *London v. Carson Pirie Scott & Company,* 946 F.2d 1534, 1538 (Fed.Cir. 1991). Nor is the doctrine a license to disregard claim limitations. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.,* 16 F.3d 394, 398 (Fed.Cir.1994). Rather, it is an equitable doctrine, *London v. Carson Pirie Scott & Company,* 946 F.2d at 1538, which expands the patentee's right to exclude from the marketplace an infringer who merely makes insubstantial changes to the claimed invention. *Valmont Industries, Inc. v. Reinke Manufacturing Company, Inc.,* 983 F.2d 1039, 1043 (Fed.Cir. 1993); *see, e.g., Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 1261 (Fed.Cir.1989) (simply exchanging known, equivalent ingredient in order to avoid the literal language of a patent

presents "classic example" of doctrine of equivalents).

> The doctrine of equivalents involves a factual determination, *Intel Corporation v. United States International Trade Commission,* 946 F.2d 821, 832 (Fed.Cir.1991), consisting of a three part inquiry.

(February 10, 1995 Order, pp. 19–20).

■ In the case at bar the doctrine entails ascertaining whether the active guarding feature in the accused device, Opens Xpress II, and the claimed limitation of the common signal return underlined *supra,* perform "substantially the same function in substantially the same way to obtain the same result." *Perkin–Elmer Corporation v. Westinghouse Electric Corporation,* 822 F.2d 1528, 1535 (Fed.Cir.1987); *accord Pennwalt Corporation v. Durand–Wayland, Inc.,* 833 F.2d at 934.[2] Having reviewed the entire record, including all of the deposition transcripts and HP's slightly revised definition of the function/way/result of the claimed invention, this court finds an insufficient basis to depart from its definition of the function/way/result of the common signal return limitation in element (b) of claim 1.

The function of the limitation in element (b) is to isolate or maintain the second node at the potential of the common signal return. The overall result achieved by the claimed limitation is guarding the capacitance measurement, that is, preventing parallel paths from interfering with the capacitance measurement of the pin under test. The way the claimed language performs this function is to connect the second nodes to the common signal return. The plain and ordinary meaning of the language of element (b) and the specification's repeated references to the common signal return in at least 15 separate places[3] demonstrate that the connection to the common signal return is the way the

---

**2.** HP acknowledges that Opens Xpress II does not literally infringe the '953 patent. Instead, it relies on the doctrine of equivalents. (Docket Entry # 126, p. 13). GenRad relies solely on the active guarding feature in Opens Xpress II to distinguish its product from the claimed common signal return limitation in element (b) of claim 1 of the '953 patent. Indeed, GenRad represents that, reading claim recitations in HP's favor, its current version of Opens Xpress meets "the limi-

tations of claim elements (a), (c) and (d)." (Docket Entry # 93, p. 5).

**3.** '953 patent, Col. 3, l. 7; Col. 3, l. 62–64; Col. 3, l. 67; Col. 4, l. 2; Col. 4, l. 51–53; Col. 4, l. 59–60; Col. 5, l. 16; Col. 5, l. 32; Col. 5, l. 42–43; Col. 5, l. 64–66; Col. 6, l. 1–2; Col. 6, l. 52–54; Col. 7, l. 63–65; Col. 8, l. 47–49 & Col. 8, l. 58.

claimed subject matter prevents parallel paths from interfering with the pin under test. Not once does the specification refer to the broader generic term of guarding to describe this way. The connection to a common signal return unquestionably forms an integral part of claim 1(b).

Turning to the accused device, Opens Xpress II does not employ this "way," that is, Opens Xpress II does not connect the second nodes to the common signal return. Instead, the way in which Opens Xpress II performs the function of maintaining the second nodes is to impress upon them a replica of the capacitive probe signal. Opens Xpress II uses an amplifier to actively force those nodes to carry the same signal as the capacitive probe.

The issue then becomes whether this way, used in Opens Xpress II, is substantially the same as the way depicted in the claimed subject matter. Although this factual finding does not preclude summary judgment, see, e.g., Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192 (Fed.Cir.1994) (affirming summary judgment of noninfringement under doctrine of equivalents); Atlanta Motoring Accessories, Inc. v. Saratoga Technologies, Inc., 33 F.3d 1362 (Fed.Cir.1994) (reversing allowance of summary judgment of infringement and denial of alleged infringer's motion for summary judgment of noninfringement under doctrine of equivalents); Johnston v. IVAC Corporation, 885 F.2d 1574 (Fed.Cir.1989) (affirming summary judgment of noninfringement under doctrine of equivalents); Spectra Corporation v. Lutz, 839 F.2d 1579 (Fed.Cir.1988) (same); George v. Honda Motor Company, Ltd., 802 F.2d 432 (Fed.Cir.1986) (same), language in the specification and its unremitting emphasis on the connection to the common signal return, is not the sole consideration.

"[E]quivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." Graver Tank, 339 U.S. at 609, 70 S.Ct. at 856. Proof may include testimony of experts, documents and disclosures in the prior art. Graver Tank, 339 U.S. at 609, 70 S.Ct. at 856. More specifically, "the test for equivalency extends beyond what is literally stated in a patentee's specification to be equivalent." Thomas & Betts Corporation v. Litton Sys-

tems, Inc., 720 F.2d 1572, 1579 (Fed.Cir. 1983). "An important factor is whether persons reasonably skilled in the art would have known of the interchangeability" of the claimed element with the accused device. Graver Tank, 339 U.S. at 609, 70 S.Ct. at 856; accord Corning Glass Works v. Sumitomo Electric U.S.A., Inc., 868 F.2d 1251, 1260 (Fed.Cir.1989) (citing Graver for same principle).

Although this court has reviewed all of the submissions of the parties as well as those pertinent to the distinctions concerning board and probe source metrology (Docket Entry # 93, Ex. B; Docket Entry # 132, Ex. B; Docket Entry # 128), the innovative nature of the invention (Bannon Declaration, Ex. 2 & 3), the inventors' references to active guarding and to guarding in general (Docket Entry # 93, Ex. F, J, K & L) and the additional evidence concerning the displays on an oscilloscope of active and passive guarding (Docket Entry # 128, ¶ 13; Docket Entry # 132, Ex. B, ¶¶ 3–5), HP presents evidence through Ralph P. Anderson ("Anderson") that the techniques of active and passive guarding "are well-known techniques for guarding measurements" and "can be used interchangeably on many applications in the automatic test field." (Docket Entry # 128, ¶ 14). Anderson also avers that the feature in Opens Xpress II which "drives the second nodes to approximately the same potential as the conductive electrode, rather than connecting the second node to the common signal return" is an insubstantial difference in the context of the claimed invention. (Docket Entry # 128, ¶ 12).

Drawing the inferences in HP's favor, Sears Roebuck and Company v. Sears Realty Company, Inc., 1993 WL 260677 at *3 (N.D.N.Y. July 8, 1993), such evidence precludes a partial summary judgment of noninfringement. This court therefore will issue a ruling on the equities based on the evidence produced at trial.

II. *PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT (DOCKET ENTRY # 113)*

HP moves for partial summary judgment that Opens Xpress I literally infringes claim

1 and dependent claims 2, 3, 5 and 6 of the '953 patent. (Docket Entry # 113). The language of claim 1 as well as the description of the invention are detailed above and need not be repeated. HP proffers the declaration of Kevin W. Keirn ("Keirn") (Docket Entry # 22 & Bannon Declaration, Ex. 1), one of the three named inventors of the '953 patent, to establish that Opens Xpress I literally infringes each element of claim 1 of the '953 patent.[4] (Docket Entry # 126).

█ GenRad limits its opposition to the partial summary judgment motion to two pages which predominantly address issues of validity, such as obviousness of the '953 patent in light of prior art. (Docket Entry # 132, pp. 20–22). GenRad's opposition, to the extent based on obviousness, however, is misplaced. Obviousness, which speaks to the validity of a patent, is an issue separate and distinct from infringement. "Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity." *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed.Cir.1983). As pointed out during arguments on the motion, neither validity nor damages are the issue with respect to the motion for *partial* summary judgment. Rather, all HP seeks is a declaration that Opens Xpress I literally infringes claims 1, 2, 3, 5 and 6 of the '953 patent.

With respect to the differences between claim 1 and Opens Xpress I, GenRad maintains that element (d) in claim 1 is not literally met in Opens Xpress I. In support thereof, GenRad offers a supplemental declaration by Moses Khazam ("Khazam") (Docket Entry # 132, Ex. E), a GenRad engineer involved in the design of Opens Xpress II (Bannon Declaration, Ex. 8).

## Discussion

█ Summary judgment is appropriate if HP demonstrates "there are no genuine issues of material fact for trial, and that [it] is entitled to judgment as a matter of law." *Sears, Roebuck and Company v. Sears Realty Company, Inc.*, 1993 WL 260677 at *3 (N.D.N.Y. July 8, 1993). Once HP presents sufficient facts, GenRad "must come forward with specific facts showing that a genuine issue for trial exists." *Sears, Roebuck and Company v. Sears Realty Company, Inc.*, 1993 WL 260677 at *3 (N.D.N.Y. July 8, 1993); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The inquiry is " 'whether the evidence presents a sufficient disagreement to require submission to a jury [or this court as the fact finder] or whether it is so one-sided that one party must prevail as a matter of law.' " *Paragon Podiatry Laboratory v. KLM Laboratories*, 984 F.2d 1182, 1185 (Fed.Cir.1993). Claim construction, for purposes of an infringement analysis, is an issue which this court may and should resolve as a matter of law.

"A literal infringement analysis requires two separate steps." *Southwall Technologies, Inc. v. Cardinal Company*, 54 F.3d 1570, 1574 (Fed.Cir.1995). The first step is claim construction, *Morton International, Inc. v. Cardinal Chemical Co.*, 5 F.3d 1464, 1468 (Fed.Cir.1993), which this court determines as a matter of law. *Southwall Technologies, Inc. v. Cardinal Company*, 54 F.3d 1570, 1574 (Fed.Cir.1995). As emphatically set forth by the Federal Circuit, the interpretation and the construction of the claims in a patent, "which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 971 (Fed.Cir.1995) ("*Markman* ").[5]

█ Having determined what is patented, the second step is to compare the accused device to the properly construed claim. *Read Corporation v. Portec, Inc.*, 970 F.2d 816, 821 (Fed.Cir.1992); *accord Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1196 (Fed.Cir.1994) ("[s]econd, the claim as

---

4. "Although a patentee can be his own lexicographer, ..., the words of a claim 'will be given their ordinary meaning, unless it appears that the inventor used them differently.' " *Hoganas v. Dresser Industries, Inc.*, 9 F.3d 948, 951 (Fed.Cir. 1993) (citation omitted).

5. Because page numbers are not yet available for volume 52 of the third series of the Federal Reporter, this court will cite to *Markman* using the Westlaw citation.

properly construed must be compared to the accused device"). In other words, "[t]he second step is to decide whether each limitation in the properly construed claim is found, either literally or equivalently, in the allegedly infringing" device. *Morton International, Inc. v. Cardinal Chemical Co.*, 5 F.3d at 1468.

▪ Under the initial step of claim construction, the first inquiry is to examine the language of the claim which defines the scope of protection. *Bell Communications Research, Inc. v. Vitalink Communications Corporation*, 55 F.3d 615, 619 (Fed.Cir.1995). In reviewing the words of the claim, this court "ascribe[s] [to them] their ordinary meaning unless it appears the inventor used them otherwise." *Bell Communications Research, Inc. v. Vitalink Communications Corporation*, 55 F.3d 615, 619 (Fed.Cir.1995); *accord Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d at 1196 (unless specification or "file history indicate that the inventor intended otherwise, a claim term will be accorded its ordinary and accustomed meaning"). In addition to the language of the claim itself, the specification and prosecution history provide additional sources of evidence as to the meaning of a term. *Markman*, 52 F.3d at 979 (Fed.Cir.1995). It is, however, the function of the claims, rather than the specification or the prosecution history, to define and delimit the right to exclude. *Markman*, 52 F.3d at 979 (Fed.Cir.1995).

▪ In determining the meaning and scope of a claim, this court may resort to extrinsic evidence, including expert testimony, in order to educate itself on the meaning of the language employed and to understand the relevant technology. *Markman*, 52 F.3d at 980 (Fed.Cir.1995). Nevertheless, such extrinsic evidence cannot vary the terms of the claims. Instead, it provides background evidence which may assist this court in its task of assigning particular meanings to the claims at issue. *Markman*, 52 F.3d at 980–982 (Fed.Cir.1995).

"To establish infringement, every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent." *Becton Dickinson and Company v. C.R. Bard, Inc.*, 922 F.2d at 796; *Laitram Corporation v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991) (same); *accord Valmont Industries, Inc. v. Reinke Manufacturing Company, Inc.*, 983 F.2d 1039, 1043 n. 2 (Fed.Cir.1993) (if "accused device lacks any limitation or an equivalent, it does not infringe the claim"). Thus, if a claim limitation set forth in claim 1 is missing from Opens Xpress I, there can be no infringement. *London v. Carson Pirie Scott & Company*, 946 F.2d at 1539.

▪ Focusing on element (d) of claim 1,[6] the measuring means, the language reads as follows:

(d) measuring means, operatively coupled to said conductive electrode, for measuring a parameter indicative of a capacitance associated with connection of said pin to said circuit assembly, said capacitance being indicative of the integrity of the electrical connection between said pin and said circuit assembly.

('953 patent, Col. 11, l. 54–61). The ordinary meaning of this language describes a "measuring means" coupled to the conductive electrode which, as disclosed in element (c), lies in a fixed position in proximity to the surface of the pin under test. The measuring means measures the parameter capacitance between the pin under test and the circuit assembly which then indicates the integrity of the connection between the pin under test and the circuit assembly.

Turning to the specification, it discloses "a current measuring means" and refers to "[t]he capacitance being measured." ('953 patent, Col. 4, l. 24 & 34). The specification also describes a "current measuring device, such as an ammeter (116)" in depicting the preferred embodiment of the invention. ('952 patent, Col. 6, l. 52–53). The specification notes that, "Through capacitive coupling, a current is passed to the electrode (106) and

---

**6.** GenRad admits that, "[T]he initial version of OPENS XPRESS option did cause the tester to guard the measurement by grounding other nodes, as GenRad's testers always had; i.e., it did make element (b)'s 'electrical connection' between a second node of the circuit assembly and said common signal return of said signal supplying means." (Docket Entry #92, p. 5).

then to the current measuring device (116)." Similarly, elsewhere, the specification reads that, "Through capacitive coupling, the current is passed to the pin (112) of the integrated circuit (110). The current (112) then passes through a connection to a printed circuit board trace (114) and the current then passes to the ammeter (116) which measures the amount of current." ('953 patent, Col. 6, l. 62–64; Col. 7, l. 5–9 & 20–22; *see also* Col. 8, l. 14–22).

The specification also refers to a voltage measuring means.[7] The pertinent language reads as follows:

Alternatively, the invention can be implemented with a voltage measuring means. In this case, current is still being measured, albeit indirectly. The voltage measured represents the current flow across a parallel impedance (often largely capacitive) formed mostly by uncontrolled stray capacitances.

('953 patent, Col. 5, l. 44–49). Due to the effect of stray capacitances, the voltage measuring means "is not the preferred embodiment" inasmuch as "[m]easurement with the current measuring means usually presents a low impedance that minimizes the error[s]" caused by the stray capacitances. ('953 patent, Col. 5, l. 49–54).

In the context of the present motion (Docket Entry # 113), neither party proffers an argument as to the meaning of element (d) based on the prosecution history. Due to the language of element (d) and its ordinary meaning as confirmed and elaborated upon in the specification as well as the silence of the parties, this court need not address the prosecution history for purposes of resolving the present motion.

Turning to the accused device, Opens Xpress I, Keirn proffers an opinion and a claim chart comparing the claims with the features of Opens Xpress I. He bases his opinion on a review of a GenRad news release, a product brochure, a description of Opens Xpress I and an article authored by or attributed to GenRad's Director of Sales Programs and, more importantly, a detailed Opens Xpress User's Guide ("user's guide").[8]

With respect to element (d), the user's guide, as pointed out by Keirn, states that, the Opens Xpress test applies "an AC signal to a node on an unpowered printed-circuit board and measuring a voltage at a plate above an IC. If the detected voltage exceeds a threshold, the pin being tested is assumed not to be open." (Docket Entry # 22(F), p. 2–3). In addition, the user's guide describes that, "The magnitude of the voltage measurement Vm is proportional to the capacitance values Cc and Csh." (Docket Entry # 22(F), p. 2–5). Keirn therefore concludes that "each element," i.e., including element (d) of claim 1, "of claims 1, 2, 3, 5 and 6 of the '953 patent is found in Opens Xpress." (Bannon Declaration, Ex. 1). Hence, based on such evidence and with respect to this motion only, the record indicates that Opens Xpress I literally infringes element (d) which, as shown by the plain language of the element, measures "a capacitance" and, interpreting the term "measuring means" in light of the specification, encompasses a voltage measuring means.

GenRad, however, proffers Khazam's supplemental declaration wherein Khazam avers that, "[N]o version of the Opens Xpress option makes a measurement of capacitance or even impedance." Furthermore, he supports this statement by explaining that:

At no time in the test is the value of the voltage applied to the pin under test's trace employed in determining whether the component pin is properly connected. In deed, the voltage is unknown during the

---

7. Claim 5 discloses: "The system of claim 1, wherein said measuring means comprises means for measuring an electrical voltage." ('953 patent, Col. 12, l. 4–6).

8. Due to this court's obligation to construe the record in HP's favor, this court finds that the user's guide at issue (Bannon Declaration, Ex. 1(I)), relates to Opens Xpress I. Although dated March 1994, page 2–4, which is missing from the latest submission of the user's guide (Bannon Declaration, Ex. 1(I)), but is present in the earlier submission (Docket Entry # 22(F)), states that, "an AC signal is applied to the pin under test while all of the IC's other pins are grounded." (Docket Entry # 22(F)). Inasmuch as Opens Xpress II does not ground the second nodes, this court infers that the user's guide and, hence Keirn's analysis, is based on Opens Xpress I, not Opens Xpress II.

test. Moreover, although one of the factors that enters into originally obtaining the threshold is the corresponding voltage taken during a learn-mode operation on a different board, that information is no longer available at the time of the test, and it cannot be inferred from the threshold value. Furthermore, even if it could be said that the original phase information could have been taken or was available during the learn-mode operation, it is not used in arriving at the threshold value. Nor is the value of source frequency used (although it is known).

(Docket Entry # 132, Ex. E). This submission creates a genuine issue of material fact as to the workings of the accused device vis-a-vis the claimed "measuring means" of element (d) of claim 1 even when construing the term measuring means to include a voltage measuring means. Partial summary judgment of literal infringement[9] on Opens Xpress I is therefore inappropriate.

### III. *DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY (DOCKET ENTRY # 100); PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE PATENT IN SUIT IS NOT INVALID (DOCKET ENTRY # 123)*

GenRad moves for partial summary judgment on the basis that claims 1, 2, 3 and 6 of the '953 patent are anticipated by: (1) a prior art capacitor test used by HP and illustrated in exhibit 25 in Keirn's deposition (Docket Entry # 103, Ex. 4) ("the prior art testers," "prior art tests" or "exhibit 25");[10] and (2) U.S. Patent No. 4,801,866 to Wixley ("the Wixley patent") (Docket Entry # 135, Ex. 1(A)).[11] (Docket Entry ## 100–103 & 135). In addition to opposing GenRad's motion for partial summary judgment (Docket Entry # 100), HP separately moved for partial summary judgment arguing that elements (c) and (d) of claim 1 of the '953 patent are not anticipated by exhibit 25. HP's motion for partial summary judgment seeks a declaration that the claims 1, 2, 3 and 6 of the '953 patent are not invalid for anticipation in view of the prior art of exhibit 25.[12] (Docket Entry # 123).

### A. *Background Re: Exhibit 25*

■■■ HP does not dispute the depiction of the prior art tests in exhibit 25 and therefore admits that "there is no genuine issue of material fact regarding the nature of the prior art." (Docket Entry # 126, p. 2). Instead, HP maintains that the prior art tests do not anticipate elements (c) and (d) as properly construed. As previously noted, elements (c) and (d) claim the following:

(c) *a conductive electrode* comprising a *surface* adapted to be placed in a fixed

---

9. HP does not proffer an argument based on the doctrine of equivalents.

10. Exhibit 25 embodies characteristics found in two of HP's prior models of in circuit testers, Nos. 3065 and 3070. For simplicity and because neither party argued that the differences between the 3065 and the 3070 models were germane to the anticipation argument, this court will assume that the models possess the same characteristics which are illustrated in exhibit 25.

11. By letter dated June 2, 1995, HP objected to the introduction of an anticipation argument based on the Wixley patent. GenRad submitted this argument in a reply brief which this court allowed GenRad leave to file on June 7, 1995. Simultaneously, this court construed the June 2, 1995 letter as a motion and allowed the alternative request therein that HP be permitted to file a response to GenRad's reply brief substantively addressing the impact of the Wixley patent. On June 9, 1995, HP filed the response which there-fore forms part of the record with respect to GenRad's motion for partial summary judgment (Docket Entry # 100).

12. In GenRad's opposition to HP's motion for partial summary judgment, GenRad argues, in part, that it is premature to declare that the '953 patent is not invalid because of obviousness under 35 U.S.C. § 103. (Docket Entry # 139). HP, however, does not seek a declaration that the '953 patent is not invalid. Instead, it seeks a declaration that "the '953 patent is not invalid for anticipation in view of such prior art," referring to exhibit 25. (Docket Entry # 123). Hence, an argument based on obviousness does not address the limited issue framed by HP. To the extent GenRad wishes to raise this argument, it may do so by motion. For purposes of addressing the limited issue raised in HP's motion for partial summary judgment, i.e., that the '953 patent is not invalid for anticipation in light of exhibit 25, however, this court will not address GenRad's obviousness argument.

position *in proximity* to a *surface* of said pin; and

(d) measuring means, operatively coupled to said conductive electrode, for measuring *a parameter indicative of a capacitance associated with connection of said pin to said circuit assembly, said capacitance being indicative of the integrity of the electrical connection between said pin and said circuit assembly.*

('953 patent, Col. 11, l. 52–61) (emphasis added).

HP narrowly construes the underlined language in element (c) as meaning a capacitive probe and the capacitance in element (d) as including the capacitance formed by the pin under test and the conductive electrode. HP submits that the above elements exclude prior art testers which make direct or ohmic contact to the circuit assembly. (Docket Entry # 126).

Turning to the prior art tests, HP publicly used these tests more than one year before the filing date of the '953 patent. These tests had the ability to detect open connections between a component pin on a circuit assembly and a circuit board trace. An AC signal from a source was applied through a probe, i.e., probe A, and a board trace, i.e., trace A, to an electrical component, i.e., capacitor C.[13] (Docket Entry ## 102 & 124, ¶¶ 1 & 2; Docket Entry # 103, Ex. 5, pp. 246–247 & 269–270).

As shown in exhibit 25, probe A connects to pin A which connects to capacitor C. Stated otherwise, pin A, one of the pins of capacitor C, is soldered to trace A. (Docket Entry # 103, Ex. 4 & 5, p. 246).

The other pin of capacitor C, pin B, is supposed to be connected to trace B but, for whatever reason, pin B is not properly connected to trace B resulting in an open connection. Probe B in the bed of nails fixture, which HP denotes as a nail and GenRad denotes as a conductive electrode, contacts trace B. Probe B was, at least in a number of situations, placed in a fixed position in proximity to the surface of pin B although such a placement is not required. In describing the prior art tests, Keirn testified that the "second probe" on the bed of nails fixture, referring to probe B, is meant to be in ohmic contact with capacitor C.[14] GenRad similarly describes probes A and B as "direct-contact" probes contacting the respective traces. Probe B is conductive and can be characterized as a conductive electrode, according to Keirn. (Docket Entry ## 102 & 124, ¶ 4; Docket Entry # 103, Ex. 5, pp. 246–247, 264 & 266; Docket Entry # 103, p. 4).

Multiple other circuit board traces, shown in exhibit 25 as trace C, are, at times, connected by probe C to a common signal return, shown in exhibit 25 as a triangular ground symbol. Probe C therefore operated to ground trace C, including any capacitance formed between trace C and trace B.[15] (Docket Entry ## 102 & 124, ¶ 5; Docket Entry # 103, Ex. 4, Ex. 5, pp. 250–251 & Ex. 6, pp. 44–45 & 66).

Relevant to comparing element (d) of claim 1 to exhibit 25, probe B is also connected to a measuring means, denoted as a current detector. The detector has an operational am-

13. The AC signal applied through the probe presumably constitutes the signal supplying means in element (a) of claim 1 of the '953 patent.

14. This court considers Keirn's deposition testimony for his personal knowledge about the characteristics of the prior art tests. This court also considers his testimony as evidence of "how those skilled in the art would interpret the claims." *See Markman,* 52 F.3d at 979 (Fed.Cir. 1995) ("[e]xpert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used").

Otherwise, except for providing background information in understanding the '953 patent and how those skilled in the art would interpret

the claims, this court does not consider Keirn's testimony for purposes of varying or contradicting the meaning of the terms in the '953 patent. This is the function of the language of the claims, the specification and the prosecution history which this court determines as a matter of law. *See Markman,* 52 F.3d at 979–982 (Fed.Cir. 1995).

Finally, this court does not attach much, if any, significance to the litigation produced affidavits of Keirn and Crook submitted to explain their deposition testimony.

15. Presumably, this characteristic corresponds to the connection between the second node and the common signal return claimed in element (b) of claim 1 of the '953 patent.

plifier and a microprocessor. It is also connected to the common signal return, again represented by a triangular ground symbol. (Docket Entry ## 102 & 124, ¶ 7; Docket Entry # 103, Ex. 4 & Ex. 5, pp. 247–248).

In sum, the prior art tests in which probe B makes ohmic or direct contact to the circuit assembly can, in some instances, place probe B, denominated as a conductive electrode by Keirn who is skilled in the art, in a fixed position in proximity to the surface of the pin under test. (Docket Entry # 103, Ex. 4 & 5, pp. 270–271).

GenRad therefore submits that, "the capacitive probe serves to form, with the component pin, the capacitor that the board itself provides in the prior" art tests. It further intimates that the term proximity does not exclude actual contact and that the term conductive electrode can include contact probes. (Docket Entry # 103, p. 5; Docket Entry # 135, pp. 7–8). And, in comparing the prior art tests exemplified by exhibit 25 and the '953 patent, GenRad's expert, LeRoy A. Prohofsky ("Prohofsky"), notes that both techniques produce an identical electrical measurement "except for specific component values." (Docket Entry # 103, Ex. 3, ¶¶ 9–10).

In contrast, HP essentially maintains that the conductive electrode claimed in element (c) cannot be in direct ohmic contact with the pin under test when elements (c) and (d) of claim 1 are construed in light of the specification and prosecution history. Instead, noting language in elements (c) and (d), HP urges that the term conductive electrode actually means a capacitive probe rather than a nail on the bed of nails fixture. (Docket Entry # 126).

Of course, element (c) does not include the language "capacitive probe." Rather, it uses the term "conductive electrode," as GenRad repeatedly points out.[16]

## B. *Anticipation and Exhibit 25*

The issue of the meaning and scope of the terms in element (c) is one of claim construc-

tion which this court may resolve as a matter of law. While GenRad relies on the principle that the specification cannot redefine terms in the claims which must be afforded their ordinary meaning, HP relies on the principle that terms in the claims are construed in light of the specification.

 The distinction is not merely a matter of semantics. Although it is "proper to use the specification to interpret what the patentee meant by using a word or phrase in the claim," it is improper to add an "extraneous limitation appearing in the specification" into the claims. *In re Paulsen,* 30 F.3d 1475, 1480 (Fed.Cir.1994) (further noting that "extraneous" means "a limitation read into a claim from the specification wholly apart from the need to interpret particular words or phrases in the claim"); *accord Minnesota Mining and Manufacturing Company v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1566 (Fed.Cir.1992) (discussing distinction between using specification to interpret and define terms in claim versus reading limitation in the specification into a claim); *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571 (Fed.Cir. 1988), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988) (specification may aid court in ascertaining "meaning of disputed language" but examples in specification are not ordinarily read into a claim).

 Anticipation requires that each and every element of a claimed invention be found, expressly of inherently, in a single prior art reference. *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d at 1570; *Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 747 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988); *see also Minnesota Mining and Manufacturing Company v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d at 1572 (to anticipate, prior patent "must sufficiently describe the claimed invention to have placed public in possession of it"). As in other contexts, it is the claims which define the claimed invention for purposes of anticipation. *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d at

---

**16.** This court omits a summary of the arguments and characteristics of element (d) inasmuch as this court resolves the motion by interpreting the scope of element (c) and comparing it to the prior art testers.

1571 ("it is the claims, not specifications, that are anticipated"). Thus, the claims measure the invention and are interpreted and accorded the same meaning for purposes of infringement and validity analyses. *Smith-Kline Diagnostics, Inc. v. Helena Laboratories Corporation*, 859 F.2d 878, 882 (Fed.Cir. 1988).

■ "The threshold requirement in claim construction is an examination of the claim at issue." *ZMI Corporation v. Cardiac Resuscitator Corporation*, 844 F.2d 1576, 1579 (Fed.Cir.1988); *accord North American Vaccine, Inc. v. American Cyanamid Company*, 7 F.3d 1571, 1575 (Fed.Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994) (in construing claims, court begins with the language of the claims themselves). "[W]ords of the claim are generally given their ordinary and accustomed meaning, unless it appears from the specification or the file history that they were used differently by the inventor." *In re Paulsen*, 30 F.3d at 1480 (addressing anticipation defense); *accord ZMI Corporation v. Cardiac Resuscitator Corporation*, 844 F.2d at 1579 (may resort to specification and prosecution history to ascertain whether inventor used disputed terms differently). Further, the claims are construed "as one skilled in the art would construe them." *SmithKline Diagnostics, Inc. v. Helena Laboratories Corporation*, 859 F.2d at 882.

■ This court may also look to the specification and the prosecution history to resolve disputed terms. *Miles Laboratories, Inc. v. Shandon, Inc.*, 997 F.2d 870, 876 (Fed.Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994) (to interpret disputed terms, court considers specification and prosecution history); *Specialty Composites v. Cabot Corporation*, 845 F.2d 981, 987 (Fed.Cir.1988) ("[w]here meaning of words in a claim is in dispute, or where different members of the community of those skilled in the art give the same term different meanings, the specification and prosecution history may provide relevant information"); *accord Genentech, Inc. v. Wellcome Foundation Limited*, 29 F.3d 1555, 1563 (Fed.Cir.1994) (because one cannot extract definition of phrase from claim, court looks to

specification); *North American Vaccine, Inc. v. American Cyanamid Company*, 7 F.3d at 1576 (where meaning of "term is in doubt, we look to the specification for guidance"); *see also Markman*, 52 F.3d at 979 (court considers three sources to resolve meaning of claims: claims, specification and prosecution history); *Minnesota Mining and Manufacturing Company v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d at 1566 (court may refer to specification and prosecution history in defining meaning of terms in claim). As noted above, the specification may support, *see, e.g., North American Vaccine, Inc. v. American Cyanamid Company*, 7 F.3d at 1576 (specification gave support to interpretation embodied in claim language), or provide guidance to aid the court in resolving disputed language, *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d at 1571, but it may not redefine the terms of the claims themselves. Consequently, particular embodiments, drawings or "examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d at 1571; *Specialty Composites v. Cabot Corporation*, 845 F.2d at 987 (same).

■ The prosecution history may also give meaning to and guidance in interpreting the claims. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corporation*, 859 F.2d at 884. "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Technologies, Inc. v. Cardinal IG Company*, 54 F.3d at 1576 (Fed.Cir.1995). For example, in the event an examiner rejected language in a claim which allowed for a more extensive interpretation of the claim and the patentee now wishes to construe the claim to encompass the more extensive interpretation then the prosecution history will operate to bar such an interpretation. *See Arachnid, Inc. v. Medalist Marketing Corporation*, 972 F.2d 1300, 1302 (Fed.Cir.1992) (prior rejection encompassed dependent and nondependent dart games whereas issued claims did not clearly provide for both dependent and nondependent games thereby permitting finding restricting scope to dependent games only).

Turning to the words of element (c), it claims: "a conductive electrode comprising a surface adapted to be placed in a fixed position in proximity to a surface of said pin." The parties disagree as to the meaning of the terms "conductive electrode" and, specifically, whether the term would include a direct contact probe in addition to a capacitive probe.[17] Hence, the parties also disagree about the meaning of the phrase "in proximity" and whether the phrase would include a surface of a conductive electrode which touches the surface of the pin under test.

The words of element (c) disclose a "conductive electrode" "comprising" of two surfaces. As defined in lexicographic sources,[18] the word "comprising" ordinarily means "to consist of" or "to be composed of" as well as "containing." *See, e.g., In re Paulsen,* 30 F.3d at 1479 (recognizing that "lexicographic sources" supported interpretation used by United States Board of Patent Appeals); *Miles Laboratories, Inc. v. Shandon, Inc.,* 997 F.2d 870, 876 (Fed.Cir.1993) (utilizing Webster's definition to illuminate meaning of word "cabinet" used in claim). Thus, whatever words grammatically modify and follow the word "comprising" serve to define the constituents which form the "conductive electrode." *See, e.g., ZMI Corporation v. Cardiac Resuscitator Corporation,* 844 F.2d at 1579–1580 (recognizing that from "grammatical point of view" certain phrase modified word electrodes). The words which follow the word "comprising" are two *surfaces* which lie "*in proximity*" to each other.

The first surface is "placed in a fixed position." Grammatically, the second surface is the surface of the pin under test. *See, e.g., ZMI Corporation v. Cardiac Resuscitator Corporation,* 844 F.2d at 1579–1580. It is these two surfaces which comprise the conductive electrode.

The term "in proximity" denotes nearness or, as applied to the location of a conductive electrode, almost touching.[19] Almost or near engenders a meaning of being close to an object without making physical contact. In the event the patentee intended to claim a direct contact probe, element (c) would include such words as "in contact with," "contiguous" or "touching" rather than "in proximity to." The claimed language therefore suggests an arrangement whereby two surfaces lie near each other (i.e., "in proximity") albeit not in direct contact.

It is true that the term "conductive electrode" standing alone might suggest a direct contact probe to one skilled in the art such as probe B in the prior art testers. Indeed, Keirn testified to this effect at his deposition as one skilled in the art.[20] It is also true that in some cases probe B can lie near the pin under test. Therefore, the phrases ("conductive electrode" and "in proximity") taken out of context or by themselves can in certain instances include the characteristics of the prior art testers. But the terms "conductive electrode" and "in proximity" in element (c) do not stand alone. Rather, element (c) discloses a "conductive electrode" which is comprised of two surfaces in proximity to each other. Such a structure suggests a capacitor. Therefore, when interpreted in the context of all of the words of element (c), the term "conductive electrode" suggests a capacitor. Moreover, such an interpretation adheres to the principle that, if possible, claims should be construed to uphold their validity. *Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d at 749.

The specification corroborates the above interpretation of the disputed term "conductive electrode." The parties agree that the examples describing the conductive electrode in the specification all depict a capacitive probe. (Docket Entry # 103, p. 12; Docket Entry # 126, p. 10). The described capacitive probe forms a capacitor with the pin under test. The specification states that "[t]he conductive electrode is effective if it is

---

17. GenRad does not dispute that the words suggest a capacitor structure. (Docket Entry # 135, p. 3).

18. *The Random House Dictionary of the English Language* (2nd ed. 1987) (unabridged).

19. *The Random House Dictionary of the English Language* (2nd ed. 1987) (unabridged) defines "proximity" as "nearness in place." It also defines "near" as "close" or "within, or to a short distance" or "almost."

20. See footnote number 18.

near the conductive circuit of the component lead being tested." ('953 patent, Col. 3, l. 42–43). The "conductive electrode (106) is placed on top of the component package (110)." ('953 patent, Col. 6, l. 51–52). After applying an oscillator voltage to a trace (114), "the oscillator voltage then appears on the pin (112)" under test. "Through capacitive coupling, a current is then passed to the electrode (106)." ('953 patent, Col. 6, l. 58–64).

Even more enlightening, the specification explains that:

> The conductor (204) forms a metallic plate, which acts as one plate of a capacitor. The other plate of the capacitor is the electrode (106), here illustrated by dashed lines, indicating that the conductor (106) is placed over the top of the integrated circuit package (110). Although the capacitor created in this manner is small, it is sufficient to conduct a signal between the electrode (106) to the pin (112).

('953 patent, Col. 7, l. 46–53).

This is not a situation in which this court is using the specification and its repeated descriptions of the conductive electrode as forming a capacitance with the pin under test to limit or redefine the terms of element (c). The language of element (c) already suggests that the two surfaces which lie near but not touching each other constitute the "conductive electrode." Such a structure does not include a direct contact probe. Rather, it suggests a capacitor structure which the specification confirms. *See, e.g., North American Vaccine, Inc. v. American Cyanamid Company,* 7 F.3d at 1576 (specification confirmed that claim referring to "a terminal portion" rather than "any terminal portion" meant a singular polysaccharide linkage inasmuch as all references in specification spoke of "a linkage, not multiple linkages"); *Miles Laboratories, Inc. v. Shandon, Inc.,* 997 F.2d at 876 (term "cabinet" in claim meant single enclosure and specification and drawings all disclosed single cabinet enclosure thus precluding literal infringement by three module enclosure); *cf. In re Paulsen,* 30 F.3d at 1480

(specification did not show a definition of "computer" different than the common definition which would include a device capable of carrying out calculations such as a calculator disclosed in an anticipating Japanese application); *Specialty Composites v. Cabot Corporation,* 845 F.2d at 986–987 (term "plasticizer" generally includes internal as well as external plasticization to those skilled in art and specification did not distinguish between external or internal plasticizer and included examples of internally plasticized polymers).

This court finds little, if anything, in the prosecution history to suggest otherwise. In fact, as explained below, the patent examiner ("the examiner") in the parent application, application '660, recognized that the term "conductive electrode" meant a capacitive probe with the capacitive coupling being the connection between the electrode and the component pin.[21] *See, e.g., Salt Lake Brine Shrimp, Inc. v. Sanders Brine Shrimp Company,* 61 F.3d 918 (Fed.Cir.1995) (claim language did not suggest cross sectional flatness and nothing in prosecution history of parent or continuation in part patent suggested defining phrase to require cross sectional flatness).

The '660 application as amended claimed, in part, "a plurality of conductive electrodes each connected to one output of said selector means and each having a surface in proximity with a surface of one of the electrical components." (Gentile Declaration, Ex. 1, No Docket Entry No. Assigned). Similar to the specification of the '953 patent, the specification of the '660 application contained language describing the conductor as forming:

> a metallic plate, which acts as one plate of a capacitor. The other plate of the capacitor is the electrode (106), here illustrated by dashed lines, indicating the conductor (106) is placed over the top of the integrated circuit package (110). Although the capacitor created in this manner is small, it is sufficient to conduct a signal from the electrode (106) to the pin (112).

---

21. Despite this argument proffered by HP, this court does not attach much significance to the interpretation given by the examiner. Rather, it is simply worth recognizing that HP did not correct the examiner's interpretation.

(Gentile Declaration, Ex. 1, No Docket Entry No. Assigned).

In allowing the '660 application as amended, the examiner noted that:

A plurality of electrodes are placed in proximity to the surface of the electrical components which have a plurality of connector pins, and *a signal is capacitively coupled from the electrode to the components* [emphasis added].

Therefore, all of the claims are allowable over the prior art of record since the prior art does not include any of the novel aspects of the independent claims mentioned above.

(Docket Entry # 24, Ex. 1; Gentile Declaration, Ex. 1, No Docket Entry No. Assigned).[22]

GenRad, however, points out that the examiner[23] in application number 892,868 ("the '953 application") rejected claim 1 which included the element of "a conductive electrode comprising a surface adapted to be placed in proximity to a surface of said pin" as unpatentable over U.S. Patent No. 4,186,-338 to Fitchenbaum ("the Fitchenbaum patent"). Instead of arguing the absence of capacitive probing, HP relied on the fact that the Fitchenbaum patent disclosed a probe being "manually moved from side to side along a short circuit trace."[24] (Gentile Declaration, Ex. 3, No Docket Entry No. Assigned). Contrary to GenRad's argument, the fact that HP relied on an easy and apparent argument to distinguish the Fitchenbaum patent does not indicate that the prosecution history reflects a construction of the term "conductive electrode" as including a direct contact probe.

As construed, element (c) is absent from the prior art testers. The probe in the prior art testers is meant to be in ohmic contact with the trace which, absent an open, contacts the pin under test. Such a probe does not capacitively couple with the pin under test. It contacts a pin via direct electrical contact. Simply stated, it is not a capacitive probe. (Docket Entry # 103, Ex. 5, p. 264).

Having so construed element (c) in light of the prior art testers, this court need not address HP's other arguments concerning the scope of element (c) and the meaning of element (d) inasmuch as such an analysis is unnecessary to resolve the motions for partial summary judgment which seek declarations of validity or invalidity through anticipation by the prior art testers depicted in exhibit 25. Having also considered GenRad's arguments, including that the definitions in the specification do not include a definition of "conductive electrode," this court finds as a matter of law that the prior art testers do not anticipate claims 1, 2, 3 and 6 of the '953 patent.

C. *Background and Anticipation Re: Wixley Patent*

■ In a reply memorandum and at the May 25, 1995 hearing, GenRad raised the issue of anticipation by the Wixley patent to support its partial summary judgment motion of the invalidity of claims 1, 2, 3 and 6 of the '953 patent. (Docket Entry # 135). At the hearing and in the reply brief, GenRad essentially refers this court to two expert declarations, one authored by Prohofsky (Docket Entry # 135, Ex. A) and the other authored by Thomas J. Nikolai ("Nikolai") (Docket Entry # 135, Ex. B).[25]

---

**22.** The excerpts of the examiner's Notice of Allowability provided by HP are somewhat illegible. This court reproduced above the statement to the extent it could decipher the excerpts. In the event this court misread the excerpted provisions, this court will, upon motion, reconsider the anticipation issue on this limited basis.

**23.** Although different examiners reviewed the '660 and '953 applications at different times, this court refers to the examiners as a group.

**24.** The Fitchenbaum patent expressly claimed, in part, "deliberately moving a probe held in the hand of a human operator back and forth across

and along one of said pair of tracks in the proximity of said path in a zig-zag manner to pick up said field and produce voltages induced therefrom." (Gentile Declaration, Ex. 3, No Docket Entry No. Assigned).

**25.** In a complex and technical case such as the one at bar, this court suggests that GenRad not rely exclusively on expert declarations without providing a detailed explanation of the legal implications of the declarations and, given that GenRad raises an anticipation defense, a more detailed explanation comparing the prior art to the elements in claim 1 of the '953 patent.

HP disputes GenRad's anticipation argument and contends that the Wixley patent does not anticipate element (a), the signal supplying means in claim 1 of the '953 patent. Because the Wixley patent must disclose, expressly or inherently, each and every element of the claims at issue (i.e., claim 1 and dependent claims 2, 3 and 6) in order to anticipate, this court focuses on element (a) of claim 1. After interpreting the meaning of element (a), this court will then examine the Wixley patent to determine whether, as a matter of law, GenRad meets its burden of establishing anticipation with regard to the signal supplying means claimed in element (a). The law noted in part III(B) remains the same and need not be repeated at length.

Claim 1 claims a signal supplying means with the following language: "(a) signal supplying means, comprising an output and a common signal return, for supplying an electrical current via said output to a pin of said electrical component." The ordinary and accustomed meaning of such language is that the invention claims a "signal supplying means" which *supplies* an "electrical current" from an output to a pin of the electrical component.

The specification does not disclose a special meaning for the above terminology. Instead, in a number of places, the specification reiterates that the signal supplying means supplies an electrical current. For instance, the specification notes that: (1) the "present invention ... comprises signal supplying means for supplying an electrical current ... [and] an electrical connection from the output of the signal means to the connection of the pin being tested" ('953 patent, Col. 2, l. 64–65 & Col. 3, l. 3–5); (2) "the present invention uses an oscillator (104) which supplies an alternating current signal ... [t]he output of the oscillator (104) is connected to the pin under test (112)" ('953 patent, Col. 6, l. 43–46); (3) when performing the test, "the oscillator voltage is applied to a trace (114) on the circuit assembly which should be attached to the pin being tested (112)" ('953 patent, Col. 6, l. 58–60); and (4) when performing the test, "the oscillator (104) is activated and a current is conducted to the electrode (106)" ('953 patent, Col. 7, l. 3–4). (*See also* '953

patent, Col. 8, l. 10–11 & Col. 9, l. 35–36 & 43–44 & 49–51).

Thus, although extraneous limitations in the specification are not read into the claims, *see Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d at 1257, the specification confirms and supports the ordinary meaning of element (a). At the risk of stating the obvious, element (a) requires a means for supplying an electrical current from an output to the pin under test.

With respect to the prosecution history, element (a) originally read: "(a) signal means, comprising an output and a common signal return, for supplying an electrical current to a pin of said electrical component." (Gentile Declaration, Ex. 3, No Docket Entry No. Assigned). In rejecting claim 1, the examiner advised HP that:

> the term "signal means" is not descriptive of its function. Perhaps the term should be changed to—signal supplying means—in order to be more clear. In lines 5–7, it is unclear whether the "output" (or "common signal return") of the signal means is used "for supplying an electrical current."

(Gentile Declaration, Ex. 3, No Docket Entry No. Assigned). Thereafter, HP amended the specification to insert the word "supplying" in various places and, more particularly, changed the term "signal means" to "signal supplying means" in element (a) and clarified that the output supplied the electrical current by adding the words "via said output" after the words "electrical current." (Gentile Declaration, Ex. 3, No Docket Entry No. Assigned). The end result is that element (a), as the language of the claim shows, clearly requires the output to supply the electrical current.

To support its burden of establishing anticipation with regard to the signal supplying means, GenRad, through Prohofsky, represents that source A in figure 2 of the Wixley patent "in some cases is a signal source in the test system coupled by ohmic contact to a board trace to which pin 71 (Fig. 5) is connected." (Docket Entry # 135, Ex. A). GenRad's other expert, Nikolai, similarly opines that "the source in some cases is a signal source in the test system coupled by ohmic contact to a board trace to which pin

71 (Fig. 5) is connected." He further states that, "The source or signal supplying means has an output and a common signal return and is intended to supply an electrical current to the connection pin via the first node."[26] (Docket Entry #135, Ex. A).

HP's expert, Paul H. Bardell ("Bardell"), disagrees with Prohofsky's interpretation. He opines that "signal source 'A' in Fig. 2 of Wixley represents a digital signal which exists on the node in the functioning circuit board." He further represents that the majority of the digital signals "exist on internal nodes and will be driven by on-board components, not by a separate signal source of the test system." Bardell explains that "[t]he only time" in which the signal generator would supply the signal to the pin of a component on the circuit board in the Wixley patent is where "the pin in question was an input pin of a component which" was "connected to a trace on the circuit board coming directly from the edge-card connection of the board with no intervening board component." And, even in this limited case, the signal generator would supply "a digital signal only to the card-edge inputs of the circuit board assembly." Bardell therefore concludes that the Wixley patent does not disclose the signal supplying means in element (a) "for supplying an electrical current to a pin ... for the purpose of testing whether such pin is connected to its trace on the board." (Docket Entry #142, Bardell Declaration).

Having reviewed the Wixley patent independently, GenRad fails in its burden of showing that the Wixley patent discloses expressly or inherently the signal supplying means in element (a). GenRad's explanation of a signal source contacting a board trace connecting to pin 71 in figure 5 of the Wixley patent and its reference to source A in figure 2 of the Wixley patent do not sufficiently disclose the signal supplying means of element (a).

The Wixley patent discloses a capacitive probe which picks up a signal from a selected point on the circuit board. The probe then capacitively couples the sensed signal. A "conditioning circuit means" operates to suppress responsive signals also picked up by the probe from points other than the selected point. The process thereby produces an output signal which corresponds with the signal picked up from the selected point. The patent further discloses a means to utilize the output signal "for test purposes." (Docket Entry #135, Ex. A(A)).

Thus, the sensed signals primarily arise from the board itself rather than from an external signal supplying means which functions to supply an electrical current to the trace and the pin under test. In lieu of supplying an electrical current from an output to the pin under test as shown in element (a), the invention disclosed in the Wixley patent seeks to minimize disturbances to the functional performance of the circuit board by using a capacitive probe which extracts signals from a selected point on the circuit board. (Docket Entry #135, Ex. A(A)). Accordingly, the signal supplying means of element (a) of claim 1 of the '953 patent is not anticipated by the Wixley patent. GenRad therefore fails to meet its burden of establishing anticipation of claim 1 and dependent claims 2, 3 and 6 of the '953 patent by the Wixley patent.

## IV. *DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY DUE TO FAILURE TO DISCLOSE BEST MODE (DOCKET ENTRY #105)*

 GenRad moves for a summary judgment of invalidity of the '953 patent due to the failure to comply with the best mode requirement of 35 U.S.C. § 112 ("section 112"). (Docket Entry #105). HP opposes the motion. (Docket Entry #134).[27]

---

**26.** Whereas Prohofsky is a technical expert skilled in the art of circuit board testing equipment who is the sole or joint inventor of 11 patents relating to electronic art, Nikolai is an expert in patent law and practice.

**27.** As reflected on the docket sheet, docket entry number 134 refers to HP's statement of facts filed under seal and submitted in response to GenRad's statement of facts. The sealed envelope, however, contains five undocketed pleadings consisting of four declarations and HP's opposition memorandum.

Before summarizing the facts, it is helpful to frame the issue based on the relevant law. Section 112 prescribes that, "The specification ... shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. The purpose of this requirement "is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived." *Glaxo, Inc. v. Novopharm, Ltd.,* 52 F.3d 1043, 1050 (Fed.Cir. 1995); *accord Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 560 (Fed.Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995) (quoting same language).

■ An analysis of the best mode requirement has two components. *Chemcast Corporation v. Arco Industries Corporation,* 913 F.2d 923 (Fed.Cir.1990). As set forth in *Chemcast* and later cases, the first inquiry centers on the inventor's state of mind at the time he filed the application. This initial determination is "wholly subjective," *Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d at 560, and "focuses on whether the inventor knew of a mode of practicing his invention at the time he filed his patent application which he considered to be better than any other." *In re Hayes,* 982 F.2d 1527, 1536 (Fed.Cir.1992); *accord Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d at 560 (same).

■ If the inventor indeed contemplated a best mode, "the second step is to compare what he knew with what he disclosed to determine whether the disclosure is adequate to enable one skilled in the art to practice the best mode." *Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d at 560. The second inquiry is largely objective and dependent on the level of skill in the art and the scope of the claimed invention. *Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d at 560. In other words, "has the inventor 'concealed' his preferred mode from the 'public.'" *Chemcast Corporation v.*

*Arco Industries Corporation,* 913 F.2d at 928.

■ GenRad bears the burden of establishing noncompliance with the best mode requirement by clear and convincing evidence. *Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d at 560. With respect to the initial inquiry, then, GenRad must establish clear and convincing evidence that, at the time Keirn and Crook[28] filed the '953 application (June 3, 1992), they knew of the best mode (an analog buffer or signal amplifier placed near or on the conductive electrode) which they considered to be better than any other mode for practicing their invention. Moreover, on a summary judgment motion, this court resolves the facts in HP's favor. Consequently, this court must resolve the issues of the inventor's state of mind, as shown in laboratory notes, depositions and declarations, in favor of HP. *Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d at 560. This court therefore turns to the factual record to assess whether GenRad meets its burden with regard to the initial inquiry.[29]

In 1991 Keirn and Crook, two of the three named inventors, were involved in developing the invention which eventually issued as the '953 patent. By the end of 1991, HP had formed a committee which met regularly to discuss progress on "C-probe." C-probe is the internal name given to a prototype of the capacitive probe.

Between December 1991 and the beginning of 1993, HP developed at least three different prototypes of the capacitive probe before introducing the TestJet product in 1993. By December 1991 HP had built a prototype of the capacitive probe at an alpha test site located at HP's Colorado Surface Mount Center ("CSMC"). An alpha site or an alpha test site is an HP facility where a prototype of a potential product is tested. As reflected in the C-probe meeting notes of December 12, 1991, "With the exception of one node, C-probe is working on ALF."

---

28. GenRad's motion revolves around Keirn's knowledge and, to a lesser degree, Crook's knowledge, of the best mode at the time they filed the '953 application on June 3, 1992.

29. The nature of the invention disclosed in the '953 patent and its claims described in prior sections need not be repeated.

ALF was the HP 3070 tester which incorporated the prototype onto a printed circuit board. (Docket Entry # 134, Keirn Declaration; Docket Entry # 108, Ex. 3).

As of December 18, 1991, the C-probe was detecting opens and appeared stable at the CSMC facility. At a January 22, 1992 C-probe meeting, Keirn addressed the issue of whether an analog buffer, i.e., an operational amplifier which imparts a gain to the signal (Docket Entry # 108, Ex. 7), would make sense to incorporate into C-probe. The issue of implementing an amplifier arose because of the large system capacitance in comparison to the probe to lead frame capacitance. After reporting his analysis of the problem, Keirn advised the group that "an analog buffer (amplifier) to enhance the effective capacitance appears to be the best solution." (Docket Entry # 108, Ex. 3; Docket Entry # 134, Keirn Declaration).

Keirn qualifies this statement, reflected in the minutes of the January 22, 1992 C-probe meeting, by explaining that he "was not sure at the time where to place the amplifier vis-a-vis the probe." He additionally notes that he did not base this statement on his "knowledge that such an amplifier was going to work or be the best way to implement the C-probe system." Further, the fact that he used the word "appears" rather than the more emphatic "is" evidences that Keirn did not believe that the amplifier was the best solution or the best mode to solve the problem of the large system to lead frame capacitance ratio. (Docket Entry # 108, Ex. 3; Docket Entry # 134, Keirn Declaration).

The notes from the February 5, 1992 C-probe meeting reflect that HP planned to implement a second alpha site on a different circuit board at the CSMC facility in the middle of April 1992. At the meeting Crook spoke about the implications of using top side switching, that is switches located "at the front end of the top side electronics." [30] Referring to current leakage problems from switches, Crook stated that the "problem is solved by placing an op-amp buffer prior to any top side muxing." Such an amplifier would enhance the signal from the capacitive probe prior to any multiplexing. (Docket Entry # 108, Ex. 3; Docket Entry # 134, Crook Declaration).

The minutes for the February 26, 1992 C-probe meeting show that the group considered and analyzed the advantages of using a passive C-probe.[31] The March 4, 1992 C-probe meeting notes characterize the active probe as being a "third solution." The March 11, 1992 C-probe minutes additionally show that Crook reported on the issue of stray capacitances and the use of "active op-amps" only as a possibility. At the March 25, 1992 C-probe meeting Crook presented a "proposal" on the use of an active probe and would "try to mock up an active probe on the 3070 by the next meeting." (Docket Entry # 108, Ex. 3; Docket Entry # 134, Keirn & Crook Declarations).

Thereafter, based on a suggestion by Crook to set up a circuit board that included an amplifier between the C-probe plate and the multiplexer, Phillip King ("King") built a functional amplifier for use on the C-probe. King tested the amplifier on a "Jetlag board" noting in his laboratory book on April 1, 1992, that it "works well" albeit with the concerns of "refining the technique—, i.e., settling time, noise, protection and layout issues!" King placed the amplifier on the C-probe plate, tested it, believed it worked well enough to continue pursuing and reported his results to Keirn and Crook. (Docket Entry # 134, Crook Declaration; Docket Entry # 108, Ex. 6 & 7).

Consistent therewith, the April 1, 1992 C-probe meeting notes report that, "The active probe prototype was successfully brought up this week on Jetlag." Crook, however, avers that in April 1992 he did not consider the active probe as "the best way to practice the C-probe system." Rather, before making such a determination, Crook "wanted to evaluate results of the use of the prototype probe to test for opens on circuit board assemblies

---

**30.** Switching or multiplexing is used to switch or multiplex the signals to the correct pin. ('953 patent, Col. 9, l. 52–59).

**31.** The C-probe meeting notes refer to the use of a capacitive probe with an amplifier as an "active probe" and the use of a capacitive probe without an amplifier as a "passive probe."

in a production testing environment." (Docket Entry # 108, Ex. 3; Docket Entry # 134, Crook Declaration).

On April 15, 1992, the C-probe group confirmed they would conduct the second alpha test on a Blackjack board. The second alpha test on the Blackjack board used active probes. In order to determine whether to practice the C-probe technique with an active probe, Keirn considered it "vital" to have information about the way an active probe worked "in a production setting." The Blackjack alpha site test, however, was "unsatisfactory," according to Keirn, "and did not provide meaningful results about the C-probe performance." (Docket Entry # 108, Ex. 3; Docket Entry # 134, Keirn Declaration).

As noted above, HP applied for the '953 patent on June 3, 1992. The C-probe project, however, continued throughout the summer and into the fall of 1992. HP conducted a third alpha test at CSMC in September 1992 using the Vesuvius board with an amplifier chip placed on the C-probe. Thereafter, HP developed another prototype probe where the amplifier was mounted on a board which in turn was mounted on the probe. According to Crook, it was not until October 1992 that an alpha site test on the Vesuvius board gave him "meaningful data about whether a probe having an amplifier on the conductive electrode would work properly." (Docket Entry # 134, Keirn & Crook Declarations).

On October 13, 1992, Keirn witnessed an internal Invention Disclosure completed and signed on this date by Ronald K. Kerschner ("Kerschner"). As indicated on the form, the invention was first explained to Keirn in November 1991. The invention disclosed, entitled "Electrode System for Detecting Open Solder Joints in Printed Circuit Assemblies," describes the use of "an active buffer as close to the [conductive] electrode as possible" in order to reduce the effects of "unwanted capacitances." [32] Construing the record in HP's favor, however, the invention explained to Keirn in November 1991 was a passive probe. (Docket Entry # 108, Ex. 4; Docket Entry # 134, Keirn & Kerschner Declarations).

Finally, Keirn attests that as of June 3, 1992, he did "not know whether the use of an amplifier on the conductive electrode would work satisfactorily to test for opens on a printed circuit board" and "certainly did not know as of [June 3, 1992] that such arrangement was the best way to practice the invention of the '953 patent." He additionally asseverates that as of June 3, 1992, he "did not know whether placing an amplifier on or near the conductive electrode of the capacitive probe . . . [was] the best way to practice my invention." Crook similarly avers that as of June 3, 1992, he "did not consider the use of an amplifier on or near the conductive electrode to be the best way of practicing the invention of the '953 patent." [33] (Docket Entry # 134, Keirn & Crook Declarations).

Viewed in HP's favor, such facts fall short of meeting GenRad's burden of establishing clear and convincing evidence on summary judgment that either Keirn or Crook subjectively knew on June 3, 1992 that the use of an amplifier on or near the capacitive probe was the best mode to practice their invention.[34] Although Keirn and Crook were aware that an active probe might constitute a best mode as of June 3, 1992, they also desired to test the amplifier in a production setting before coming to any conclusions. As averred in their declarations, as of June 3, 1992, they did not consider the use of an amplifier placed on or near the conductive

---

**32.** At an undetermined point in time, HP filed a patent application related to the '660 application which disclosed, in part, the use of "an active circuit buffer (208)" connected to the "capacitive plate (202)" at "location (314)." The application further notes that, "The amplification of the signal by the buffer circuit (208) which is in close proximity to the capacitive plate (202) where the signal is received helps to significantly optimize the signal to noise ratio, thereby decreasing the effect of system noise and stray capacitance."

(Docket Entry # 134, Gentile Declaration, Ex. 4; Docket Entry # 108, Ex. 5).

**33.** GenRad also submits subsequently developed marketing materials describing the development of an active probe which this court has reviewed and considered. (Docket Entry # 108, Ex. 1 & 2).

**34.** This court therefore need not address the issue of the sufficiency of the disclosure.

**1500**

electrode as the best mode of practicing their invention. GenRad therefore fails to meet its burden on summary judgment of establishing the invalidity of the '953 patent due to noncompliance with the best mode requirement.

### Conclusion

In accordance with the foregoing discussion, HP's motion for partial summary judgment of infringement with respect to Opens Xpress I (Docket Entry # 113) is **DENIED.** GenRad's motion for partial summary judgment of noninfringement with respect to Opens Xpress II under the doctrine of equivalents (Docket Entry # 90) is **DENIED.** GenRad's motion for partial summary judgment of invalidity (Docket Entry # 100) is **DENIED.** HP's cross motion for partial summary judgment (Docket Entry # 123) is **ALLOWED** inasmuch as claims 1, 2, 3 and 6 of the '953 patent are not invalid as anticipated by exhibit 25. GenRad's motion for summary judgment due to the failure to disclose the best mode (Docket Entry # 105) is **DENIED.**